IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK
_____

BALMINDER SINGH,

                              Petitioner,

                                                    **Report and Recommendation**
          v.                                        **No. 07-CV-6387(CJS)(VEB)**

CHARLES MULE, Facilities Director,
Buffalo Federal Detention Facility,
WILLIAM CLEARY, District Director
DRO Field Office; and ALBERTO GONZALES,
Attorney General of the United States,

                              Respondents.


_____


## I.      Introduction

          *Pro se* petitioner Balminder Singh ("Singh"), an Indian national and an alien under a final

order of removal, filed a petition for a writ of habeas corpus  alleging that his detention in

administrative custody by the Department of Homeland Services Immigration and Customs

Enforcement("DHS") pursuant to INA § 241, 8 U.S.C. § 1231 violates the federal immigration

statute, as well as substantive and procedural due process.  (Petition, Docket No. 1). This matter

was referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1) for, *inter alia*, the issuance of

a report and recommendation regarding the disposition of Singh's petition.

## II.     The Immigration Proceedings

          Singh is a native and citizen of India who entered the United States without inspection at

or near West Palm Beach, Florida, on or about December 19, 1999.  That same date, Singh was

placed in removal proceedings by means of a Notice to Appear charging that pursuant to

Immigration and Nationality Act ("INA") § 212(a)(6)(A)(i), 8 U.S.C. § 1182(a)(6)(A)(i), he was subject to removal as an alien present in the United States without being admitted or paroled, or who arrived in the United States at any time or place other than one designed by the Attorney General. Singh was released on an immigration bond on December 29, 1999. On October 18, 2004, an immigration judge ("IJ") ordered Singh removed from the United States to India.[1]

While Singh was free on bond, Singh was arrested for, and subsequently convicted on, one count of second degree rape (New York Penal Law § 130.30(1)),[2] in the Supreme Court of the State of New York, County of Queens, on April 18, 2005. Singh was sentenced to a term of imprisonment of one to three years.

Concurrently with Singh's criminal proceeding in Queens County Court, the United States Government was making arrangements with the Consulate General of India in New York City (hereinafter referred to "India" or "the Indian consulate") to issue travel documents for Singh. Five days before Singh's conviction was entered in Queens County Court, the Indian consulate sent a letter to DHS notifying it as follows:

> Please refer to your request dtd. Nov. 18, 2004 for the issue of a travel document in favour of Mr. Balwinder[3] Singh to enable him to be deported.
> The Consulate is ready to issue a travel document to Mr. Singh.
> You are requested to present Mr. Singh at this Consulate on any working day with prior appointment.

---

[1]     Singh did not file an administrative appeal of the IJ's decision to the Bureau of Immigration Affairs ("BIA"); nor has he sought judicial review of the removal order. The parties did not dispute that Singh presently was under a final order of removal.

[2]     Under Penal Law § 130.30(1), a person is guilty of rape in the second degree when, "being eighteen years old or more, he or she engages in sexual intercourse with another person less than fifteen years old . . . ." N.Y. PENAL LAW § 130.30(1). Penal Law § 130.30(1), one of New York's "statutory rape" statutes, *People v. Yates*, 168 Misc.2d 101 (N.Y. Supt. 1995), does not contain an element of "forcible compulsion."

[3]     "Balwinder" is apparently the correct phonetic spelling in English of petitioner's Sikh first name.

Letter from Ramesh Chand dated April 13, 2005, submitted by respondents as Exhibit A (Docket No. 5-3) to the Declaration of George Scott ("Scott Decl.") (Docket No. 5-2).

However, Singh was "unavailable for removal" in April 2005 because he was incarcerated at a New York State correctional facility as a result of his second degree rape conviction. Although India appeared to have been ready in April 2005 to issue a travel document for Singh, the Department of Homeland Security,  Immigration and Customs Enforcement ("DHS/ICE")  never actually had the travel document in hand. Thus, when Singh completed his prison term on or about February 8, 2007, the undelivered travel documents were about two years old.

Upon his release from state prison, Singh was transferred into the custody of DHS/ICE, and the Government almost immediately began writing to the Indian consulate seeking confirmation as to whether the it was "still prepared to issue a travel document for Mr. Singh." *See* Letter from Charles Mule to Consulate of India, attaching April 13, 2005 Letter from R. Chand, Consulate of India to F. Jeudy of DHS/ICE (Docket No. 5-3). This letter, which apparently was dated February 12, 2007, was not answered by the Indian Consulate.

On February 20, 2007, ICE Deportation Officer Vincent F. Pulcini wrote to Chand at the Indian consulate, requesting "clarification of the status of a travel document" for Singh. Pulcini indicated that ICE "would like to effect [Singh's] removal to India in an expeditious manner" and noted that "Mr. Singh has stated that he would like to return to his homeland as soon as possible." *See* Docket No. 5-3. This letter was not answered by anyone at the Indian Consulate.

Apparently, another letter was written by a DHS/ICE official to Chand at the Consulate on February 27, 2007, but the Court has not been provided with a copy of this letter. However,

other documentation in the record makes clear that DHS/ICE never received a response to the

February 27, 2007 letter.  The next letter in the record before the Court is dated March 12, 2007.

It was, in sum and substance, identical to the earlier letters. This letter, like the previous ones,

received no reply from the Indian Consulate.

Meanwhile, on May 1, 2007, a "90-day File Review" was completed for Singh, and as a

result, "continued detention was ordered . . . ." *See* Undated Memorandum from V. Pulcini to

Headquarters Custody Determination Unit (Docket No. 5-3 at p. 4).

About three months after his March 2007 letter to the Indian Consulate, Deportation

Officer Pulcini wrote to the Headquarters Travel Document Unit ("HQDTU") on June 6, 2007,

detailing his office's attempts to obtain verification as to India's intent to issue a travel document

for Singh. Pulcini commented,

> It has been our [i.e., DHS/ICE's] experience that travel documents for nationals of
> India have been extremely difficult to obtain from the Consulate General of India
> in New York. Mr. Ramesh Chand has proven to be very difficult to reach by
> telephone, facsimile, or express mail and more often than not has failed to respond
> to requests from our office regarding cases of nationals of India.

Memorandum from Deportation Officer V. Pulcini to HQDTU (Docket No. 5-3 at p.7); *see also*

Scott Decl., ¶19. Deportation Officer Pulcini then requested that HQDTU provide assistance

"relative to the travel documents for this alien . . . ."

It appears that HQDTU's efforts were similarly unsuccessful. Deportation Officer Pulcini

commented in a subsequent, undated memorandum to Headquarters Custody Determination Unit

("HQCDU"), that he had sent a request for assistance in obtaining a travel document on June 6,

2007, to HQDTU but had "not received any information from HQDTU regarding this request" to

date. *Id.* (Docket No. 5-3 at p. 4). Because DHS/ICE had not yet received travel documents

through HQDTU's assistance, Deportation Officer Pulcini referred Singh's case to HQCDU "for

a post 180 day [8 C.F.R. §] 241.3 review in accordance with current regulations." *Id.* (Docket

No. 5-3 at p. 4).

On September 17, 2007, Singh apparently made a request "for HQPDU determination of

the prospects of his removal after the six months post-removal period of passed." Petitioner's

Reply Memorandum ("Pet'r Reply") at 6 (Docket No. 15). However, HQPDU did not respond to

the request until October 15, 2007, "after the service of the habeas corpus on ICE," *id.* As

HQPDU's decision, dated October 15, 2007, notified Singh that he was not going to be released

from custody at that time "based on a review of [his] file record and/or personal interview and

consideration of any information [he] submitted to ICE reviewing officials." HQCDU Decision

to Continue Detention dated October 15, 2007 (Docket No. 13-3 at p. 1).  However, the only

reason given in the decision for continuing to hold Singh in custody was as follows: "ICE *expects*

that a travel document will be issued for you and that your removal will occur in the reasonably

foreseeable future. Therefore, you are to remain in ICE custody at this time." *Id.* (Docket No. 13-

3 at p. 1) (emphasis supplied). Singh argued that HQPDU's denial did not assert the existence of

a "special circumstance," as defined in 8 C.F.R. § 241.14, which states that the Government

"may invoke the procedures of this section in order to continue detention of particular removable

aliens on account of special circumstances even though there is no significant likelihood that the

alien will be removed in the reasonably foreseeable future." 8 C.F.R. § 241.14; *see also* Pet'r

Reply at 6 (Docket No. 15).[4] Singh did not receive any further custody reviews after October 15,

---

[4]      DHS/ICE did not rely on 8 C.F.R. § 241.14 to detain Sing based on "special circumstances" (e.g.,
a finding that the alien is specially dangerous because of mental illness); that regulation only comes into play if the
Government concedes that there is no significant likelihood of deportation in the reasonably foreseeable future. *See* 8
C.F.R. § 241.14. In Singh's case, DHS/ICE did not waver from its position that removal was "reasonably

2007. By the time I issued my Report and Recommendation in August 2008, over nine months

ago since the last custody review had elapsed.

The next activity in Singh's case with regard to efforts to obtain travel documents was

four months after the second custody review. On February 7, 2008, ICE sent "updated Indian Pro

Forma Forms to HQDTU". *See* Travel Document Issuance Log (Docket No. 13-3 at p. 3).

Over three months passed before another notation was placed in the travel document log:

On May 29, 2008, a DHS/ICE deportation officer "left message with Consulate as to TD status".

*See* Travel Document Issuance Log (Docket No. 13-3 at p. 4). In August 2008, there were *no*

further entries in the travel log.[5]

## III.    Procedural History of This Habeas Proceeding

### A.    This Court's Previous Report and Recommendation

On August 14, 2008, I issued a Report and Recommendation (Docket No. 16)

recommending that Singh's petition be granted because, in my opinion, Singh had fulfilled the

Supreme Court's requirements set forth in *Zadvydas v. Davis,* 533 U.S. 678 (2001), by

establishing that his continued detention in DHS custody was no longer constitutionally

authorized.[6] At the time of the August 2008 Report and Recommendation, Singh had been

---

foreseeable." In any event, I note that at least two courts have found 8 C.F.R. § 241.14 to be invalid and not a
permissible interpretation of the statute authorizing detention of a removable alien beyond the 90-day removal
period. *Tran v. Mukasey*, 515 F.3d 478, 484 (5th Cir. 2008); *Hernandez-Carrera v. Carlson*, 546 F. Supp.2d 1185
(D. Kan. 2008).

[5]      Copies of the travel document log were submitted to this Court by respondents on July 31, 2008, in
opposition to Singh's motion for summary judgment.

[6]      After reviewing the statutory history of the applicable immigration laws, the Supreme Court "found
nothing . . . that clearly demonstrates a congressional intent to authorize indefinite, perhaps permanent, detention."
*Id.* at 699. Consequently, in order "to avoid a serious constitutional threat," the *Zadvydas* majority concluded that
"once removal is no longer reasonably foreseeable, continued detention is no longer authorized by statute." *Id.*
(citation omitted). Specifically, the Supreme Court determined in *Zadvydas* that six months was a presumptively

detained in DHS/ICE custody since February 8, 2007—a period of one year and six (6) months.[7]

Respondents argued that Singh's repatriation was reasonably foreseeable because there was "no

indication that a travel document [would] not be issued for [him]." Respondent's Memorandum

in Opposition at 12 (Docket No. 13) (emphasis supplied). I did not find respondents' argument

that "no news was good news" to be persuasive. In particular, I noted that there had been only a

five-month delay between DHS/ICE's initial request for travel documents in November 2004 and

the Indian Consulate's letter stating its readiness to issue travel documents for Singh in April

2005. However, there had been eighteen-plus-months of silence and inaction following

DHS/ICE's request to the Indian consulate in February 2007, after Singh was released from

prison, for confirmation that it still intended to issue travel documentation for him. In my

opinion, this was more than just a "mere passage of time" or "bureaucratic inertia" but rather was

the product of the Indian Consulate willfully ignoring DHS/ICE's repeated requests for

information.

     Respondents also argued that Singh's deportation was reasonably foreseeable because

---

reasonable duration of post-removal-period detention. *Id* at 701. However, after this six month period elapses, the alien may come forward with evidence to show that his or her removal is not reasonably foreseeable. *See id.* Specifically, once the alien provides "good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future, the Government must respond with evidence sufficient to rebut that showing." *Id.* Furthermore, the Supreme Court noted, "for detention to remain reasonable, as the period of prior postremoval confinement grows, what counts as the 'reasonably foreseeable future' conversely would have to shrink." *Id.*

     [7]     I noted in my previous Report and Recommendation that the last correspondence or communication received from the Indian consulate was in April 2005, *before* the date of Singh's criminal conviction. It was not apparent to me from the record whether the Indian consulate knew that Singh was in the midst of criminal proceedings on a rape charge when the India consulate stated its readiness to provide travel documentation for him in April 2005. I noted that DHS/ICE first wrote to the Indian consulate in November 2004, and it was not clear when Singh was arrested and indicted.  Given that in the year and a half following his release from state court custody, the Indian consulate had ignored all of the Government's requests for travel documentation for Singh, I thought it would not be unreasonable to infer that when the Indian consulate initially agreed to issue travel documents, it was not aware of Singh's criminal conviction, and that the current the lack of any reply by the Indian government to all official communications from DHS/ICE regarding Singh could have been the result of "stonewalling" to avoid returning an individual convicted of rape to his country of origin.

they were continuing to make "good faith efforts" to remove Singh.  In response to this, I noted

that the Supreme Court in *Zadvydas* had rejected the Fifth Circuit's conclusion that "continued

detention [was] lawful as long as 'good faith efforts to effectuate . . . deportation continue' and

[the alien] failed to show that deportation [would] prove 'impossible.'" *Zadvydas*, 533 U.S. at

702 (quoting *Zadvydas v. Underdown*, 185 F.3d 279, 294, 297 (5th Cir. 1999) (ellipsis in

original)). According to the majority in *Zadvydas*, such a standard "would seem to require an

alien seeking release to show the absence of *any* prospect of removal–no matter how unlikely or

unforeseeable–which demands more than [its] reading of the statute can bear." *Id.* (emphasis in

original).

Respondents also advanced a statistically-based argument, urging this Court to find that

Singh's removal was reasonably foreseeable because "DHS ha[d] successfully repatriated many

hundreds of aliens to India in recent years." Scott Decl., ¶21 (Docket No. 13-2). Respondents

quoted from figures from DHS reports as to how many "aliens" were removed to India in fiscal

years 2004, 2005, and 2006 (467, 419, and 405, respectively). *Id.* (Docket No. 13-2). I found

these statistics to be incomplete and virtually meaningless since respondents had  not provided

information regarding how many aliens *total* were attempted to be removed by DHS to India for

these years and how many, if any, had been convicted of crimes. *See Seretse-Khama*, 215 F.

Supp.2d 37, 49 (D. D.C. 2002). I also concluded that relying on such generalities would require

me to ignore the circumstances of Singh's case–namely, that DHS/ICE had failed to obtain travel

documents for over a year and a half, and that Indian government had refused to even respond to

DHS/ICE's repeated missives and phone calls. Thus, I concluded, respondents' past successes in

removing aliens to India did not amount to a significant likelihood of removal *of Singh* in the

reasonably foreseeable future. *See Seretse-Khama v. Ashcroft*, 215 F. Supp.2d at 49.

At the time of my Report and Recommendation in August 2008, I could not conclude that the Government's continuing efforts to remove Singh were likely to be efficacious. All respondents could offer at that time was the following:

> According to information provided on July 25, 2008, by Staff Officer Michael Koransky of Detention and Removal Operations at DHS Headquarters in Washington, D.C., Singh's case was submitted, along with approximately 90 others, to the Ministry of Home Affairs (MHA) in New Delhi, India, via ICE attache in that country. Officer Koransky reported that the MHA recently determined that more than 55 of the cases were identified as nationals of India. As of the time of Officer Koransky's report, DHS had not learned which of the cases were so identified. However, the next step after specific identifications are made is for the MHA to work with the Ministry of External Affairs in the United States to determine how to issue travel documents.

Scott Decl., ¶23 (Docket No. 13-2). In my opinion, the foregoing was of questionable relevance to Singh's case because, among other reasons, there had never been an issue regarding whether or not Singh was a national of India. The Government had always maintained that Singh was and is an Indian national. Singh did not dispute that he was born in India and is of Indian citizenship. Indeed, DHS/ICE represented in its correspondence with the Indian Consulate that Singh had indicated that he wished to return to his homeland (i.e., India) as soon as possible.

Moreover, the Government admitted in the passage quoted above that it had no idea whether Singh was included in the group of 55 nationals identified by the Indian MHA. Nor was the Government able to provide an estimate as to when it would obtain confirmation of that fact. I noted that even assuming Singh had been included in the group of 55 Indian nationals, the Government's receipt of confirmation of that fact would only mark the *beginning* of the process of determining, in respondents' words, "how to issue travel documents" for those individuals. At

the time of my Report and Recommendation, respondents did not give an estimate as to how long *that* would take.

In sum, as of August 2008, respondents were not able to explain its inability to obtain approval of travel documentation for Singh over a period of eighteen months. I could not find that the declaration of Deportation Officer George Scott (Docket No. 13-1), opposing Singh's motion for summary judgment, provided any assurance that his removal would occur "in the reasonably foreseeable future." Rather, the declaration confirmed what another DHS/ICE deportation officer noted in an earlier memorandum to HQDTU–that the Indian government takes an exceedingly long time to review requests for repatriation. Yet, experience in Singh's own case showed that, following the first request for travel documents in 2004, the Indian Government responded in only five months. In my opinion, respondents' submissions provided no confidence as to when, or even whether, Singh would ever be repatriated.

I also noted that since the initial burst of activity when Singh first entered DHS custody, the Government's efforts at removal had not been consistent. Indeed, after the DHS/ICE field office requested assistance from HQTDU in June 2007, the DHS/ICE field office did nothing further itself on Singh's case until May 2008, when someone placed another phone call to the Indian consulate. However, the DHS/ICE field office never received any acknowledgment that HQDTU was prepared to offer assistance, so it did not seem to make sense for the field office to cease its efforts. In any event, almost a full year lapsed without evidence of efforts by any arm of the Government's immigration authorities to remove Singh.

At the time of my previous Report and Recommendation, I could not find, in the information provided by respondents, any hint that the state of affairs could change in the

reasonably foreseeable future. The situation appeared to be at a stalemate, through no fault whatever of Singh's. Indeed, Singh forewent an appeal of his removal order, and did not contest removal. Respondents never alleged, and there was no evidence in the record, that Singh had attempted to frustrate the Government's attempts to remove him, or had withheld his cooperation, or had provided false or misleading information that impeded the issuance of travel documents. *See* 8 U.S.C. § 1231(a)(1)(C) ("The removal period shall be extended beyond a period of 90 days and the alien may remain in detention during such extended period if the alien fails or refuses to make timely application in good faith for travel or other documents necessary to the alien's departure or conspires or acts to prevent the alien's removal subject to an order of removal."). Furthermore, DHS/ICE, in conducting their detention reviews of Singh, based their decision to continue holding him in custody *solely* on their hopeful "expectation" that a travel document would be issued by India in the reasonably foreseeable future. Thus, there was no indication that DHS/ICE feared that Singh was a dangerous threat to public safety if he were to be conditionally released. Moreover, there was no suggestion that Singh was a flight risk and would not appear for deportation, since he had indicated to DHS/ICE that he wished to return to his native country as soon as possible.[8]

Based on my review of the pleadings and the documentation submitted by respondents with regard to Singh's case, I believed that Singh has succeeded in demonstrating "good reason to believe that there [was] no significant likelihood of removal in the reasonably foreseeable future," *id.,* and that respondents failed to rebut Singh's showing under *Zadvydas*. Accordingly, I

---

[8]        The Court does recognize the Government's apprehension that deportable aliens whose country of origin refuses to allow their return may pose a risk of flight. However, regulations have been promulgated that describe detailed conditions of release for aliens subject to a final order of removal. *See* 8 C.F.R. § 241.5.

recommended that Singh's motion for summary judgment be granted and that an order be issued directing his immediate release from custody, pursuant to conditions and appropriate supervision to be determined by DHS/ICE.

**B.      Respondent's Motion for Reconsideration**

Respondents then filed a motion for reconsideration (Docket No. 17), asserting that they had made progress in obtaining travel documents from the Consulate of India. Respondents indicated that the Indian Consulate had asked to schedule a face-to-face interview with Singh, and DHS responded with an offer to present Singh for the interview on August 28, 2008. Respondents further submitted that "the mere passage of time, without more, in this case is not sufficient to make the showing required of an alien who seeks release from a lengthy detention." *Id.* (Docket No. 18).

In support of their motion for reconsideration, respondents submitted the Affidavit of George F. Scott, of DHS, who stated that in his experience, "the Consulate of India often issues a travel document on the same day that an interview with the subject alien is held." Scott Aff., ¶10. (Docket No. 17). Scott averred that "based on this new information as set forth herein, DHS continues to have an expectation that Singh will be removed from the United States within the reasonably foreseeable future. Further, based upon my review of the facts of this matter and my experience, it is my expectation that under the circumstances presented here, a travel document will be issued, after which time DHS will be able to make the necessary travel arrangements for Singh to be released from custody by his removal to India." *Id.*, ¶11. (Docket No. 17).

Unfortunately, respondents' expectations were not realized, as detailed in Singh's response to respondents' motion for reconsideration. *See* Docket No. 20. Singh confirmed that he

had been interviewed by the Indian Consulate on August 28, 2008. *Id.* However, Singh stated, no travel document was issued at that time. Furthermore, the Indian Consulate gave the Government no oral or written confirmation that a travel document would be issued "today, next week, next month, or even next year." *Id.* (Docket No. 20).

Noting the absence of any information from respondents as to the outcome of Singh's interview with the Indian Consulate, I directed respondents to file additional documents substantiating their claim that a travel document was forthcoming. *See* Docket No. 21. On October 29, 2008, respondents confirmed that they had obtained a travel document for Singh. *See* Docket Nos. 21 & 25. AUSA Mitchell indicated that she had received email confirmation from Deportation Officer Gunther that Singh's removal was tentatively scheduled for a specific date within the next month (i.e., November 2008). For security reasons, the Government did not attach the email containing the exact date because the precise date was not to be publicly disclosed. However, the Government indicated that specifics could have been provided had the Court submitted a request.

### C.    Respondent's Motion to Dismiss

Respondents now have filed a motion to dismiss the petition as moot (Docket No. 26), on the basis that they executed Singh's removal order on November 23, 2008, and that he has been deported from the United States to India. *See* Affidavit of Assistant United States Attorney Gail Y. Mitchell, Esq. ("Mitchell Aff.") (Docket No. 26-1). AUSA Mitchell indicated that on December 2, 2008, she received from a representative of DHS documents confirming the execution of a Warrant of Removal/Deportation for Singh. Mitchell Aff., ¶4 (Docket No. 26-1). The Warrant of Removal/Deportation (Docket No. 26-2) is attached as Exhibit A to AUSA

Mitchell's Affidavit. The Warrant indicates that DHS removed Singh from the United States on November 23, 2008, from Newark Airport in New Jersey.

For the reasons that follow, I agree with respondent that Singh's deportation renders his habeas petition challenging his detention moot. Accordingly, I recommend dismissal of Singh's petition with prejudice.

## III.   Analysis of the Motion to Dismiss

Section 2241(c)(1) of Title 28 of the United States Code provides that district courts may consider habeas petitions from prisoners "in custody under or by color of the authority of the United States." The "in custody" requirement is satisfied if the petitioner files the habeas petition before being deported. *Accord, e.g.*, *So v. Reno*, 251 F. Supp.2d 1112, 1120 (E.D.N.Y. 2003) (citing Gonzalez v. INS, 2002 WL 31444952 (S.D.N.Y.2002) (petitioner satisfies "in custody" requirement of 28 U.S.C. § 2241 so long as in physical custody at the time the petition is filed even if later deported)); *see also Spencer v. Kemna*, 523 U.S. 1, 7 (1998) (incarceration of petitioner at the time the petition is filed is sufficient to satisfy "in custody" requirement of 28 U.S.C. § 2254 even if petitioner is released before petition decided).

"A non-citizen who has been deported must go beyond satisfying the 'in custody' requirement of the federal habeas statute; it must also be demonstrated that the case is not moot as a result of the deportation." *So v. Reno*, 251 F. Supp.2d at 1121.  "'[A] case is moot when the issues presented are no longer "live" or the parties lack a legally cognizable interest in the outcome.'" *County of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979) (quoting *Powell v. McCormack*, 395 U.S. 486, 496 (1969)); *accord County of Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000); *New York City Employees' Retirement System v. Dole*, 969 F.2d 1430, 1433 (2d

Cir.1992). The concern underlying the mootness doctrine is that "when the challenged conduct ceases such that there is no reasonable expectation that the wrong will be repeated, then it becomes impossible for the court to grant any effectual relief whatever to [the] prevailing party, *County of Erie v. Pap's A.M.*, 529 U.S. at 287 (internal quotations omitted); *see also Church of Scientology of Cal. v. United States*, 506 U.S. 9, 12 (1992); *Mills v. Green*, 159 U.S. 651, 653 (1895)). In such case, "any opinion as to the legality of the challenged action would be advisory." *Id.*

DHS has effectuated Singh's removal from the United States, as demonstrated by the executed Warrant of Removal/Deportation (Docket No. 26-2).  By virtue of his removal from the United States, Singh has been released from his detention in administrative custody of DHS. This release from detention was the only relief he requested in his petition pending before this Court. Thus, since there is no "effectual relief," *County of Erie v. Pap's A.M.*, 529 U.S. at 287, that this Court can now provide to Singh,[9] his habeas petition has been rendered moot.

## IV.   Conclusion

For the foregoing reasons, I recommend finding that Singh's habeas petition no longer presents a "live" case or controversy for purposes of satisfying Article III, Section 2 of the United States Constitution. Accordingly, I recommend that respondents' motion to dismiss the petition (Docket No. 26) be granted and that Singh's petition ( Docket No. 1) be dismissed as moot. Consistent with this Report and Recommendation, my previous Report and Recommendation

---

[9]      The REAL ID Act of 2005, Pub.L. No. 109-13, 119 Stat. 231 (codified at 8 U.S.C. § 1252 ), divested the district courts of jurisdiction over petitions for habeas corpus relief challenging final orders of removal. *Ogunwomoju v. United States*, 512 F.3d 69, 75 n.9 (2d Cir. 2008). District courts retained jurisdiction over an alien's challenge to his detention in custody by the immigration authorities. *Hernandez v. Gonzales*, 424 F.3d 42, 42-43 (1st Cir. 2005) (citing H.R. Cong. Rep. No. 109-72, at 2873 (May 3, 2005) and collecting cases)); *accord Reginald v. Bureau of Immigration and Customs Enforcement*, No. 06-CV-0258E(Sc), 2006 WL 2949696, at *2 (W.D.N.Y. Oct. 16, 2006) (Elfvin, D.J.) (adopting report and recommendation of M.J. Scott).

granting the petition (Docket No. 16) should be withdrawn. Respondents' motion for reconsideration (Docket No. 17) should likewise be dismissed as moot, as should petitioner's motion to expedite (Docket No. 10) and motion for summary judgment (Docket No. 11).

Because Singh has not made a substantial showing of a denial of a constitutional right, I recommend that a certificate of appealability not issue. *See* 28 U.S.C. § 2253(c)(2) ("A certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right."); *see also Lucidore v. New York State Div. of Parole*, 209 F.3d 107, 112 (2d Cir. 2000).

*/s/ Victor E. Bianchini*
_____
VICTOR E. BIANCHINI
United States Magistrate Judge

Dated: January 7, 2009
        Rochester, New York.

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report and Recommendation in accordance with the above statute, Fed. R. Civ. P. 72(b) and Local Rule 72.3(a)(3).

The District Court ordinarily will refuse to consider on *de novo* review arguments, case law and evidentiary material which could have been, but was not, presented to the Magistrate Judge in the first instance. *See, e.g.*, *Patterson-Leitch Co., Inc. v. Massachusetts Municipal Wholesale Electric Co.*, 840 F.2d 985, 990-91 (1st Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Wesolek v. Canadair Ltd.*, 838 F.2d 55 (2d Cir. 1988); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

The parties are reminded that, pursuant to Rule 72.3(a)(3) of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 72.3(a)(3), or with the similar provisions of Rule 72.3(a)(2) (concerning objections to a Magistrate Judge's Decision and Order), may result in the District Court's refusal to consider the objection.**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to petitioner and respondent.

**IT IS SO ORDERED.**

/s/ *Victor E. Bianchini*

_____

VICTOR E. BIANCHINI
United States Magistrate Judge

Dated: January 7, 2009
        Rochester, New York.